IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CHICAGO TITLE INSURANCE COMPANY, a Florida corporation; CHICAGO TITLE COMPANY OF WASHINGTON, a Washington corporation,<br><br>　　　　　　Respondents,<br><br>　　　v.<br><br>DAVID GEORGE ESSIG, a resident of the State of South Carolina,<br><br>　　　　　　Appellant. | No. 88284-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — David Essig appeals from a judgment and its underlying findings of fact and conclusions of law that ultimately imposed a constructive trust on certain funds in his possession for the benefit of Chicago Title Insurance Company. The trial court had determined Essig's possession of those funds was unjust because he knew they had been fraudulently obtained in order to satisfy a judgment owed to him. Essig challenges several of the trial court's findings of fact and conclusions of law, but they are properly supported, and we affirm.

FACTS[1]

The case before us began when David Essig sued Michael Lai in 2016 over issues related to their employment contract, including unpaid wages and benefits

---

[1] Because Essig has not challenged the vast majority of the findings of fact (FF) made by the trial court, they are verities on appeal and form the basis for these facts unless otherwise indicated. *See Jensen v. Lake Jane Ests.*, 165 Wn. App. 100, 105, 267 P.3d 435 (2011).

owed to Essig. *See Essig v. Lai*, 9 Wn. App. 2d 587, 444 P.3d 646 (2019). The trial court in the instant matter found, and neither party disputes, that Essig secured a judgment against Lai in that case "in the original amount of $555,861.28, plus post-judgment interest (the 'Essig Judgment')." Brian Keeley represented Essig in the 2016 suit against Lai, and Keeley continued working on collection of the judgment between 2018 and 2021. Keeley was largely unsuccessful in those efforts and, in November 2020, he filed a second lawsuit against Lai and entities purported to be associated with Lai, including Great Seattle Development, LLC (GSD) on Essig's behalf (Second Essig Lawsuit).

The trial court found, and it is undisputed on appeal, that "Lai, purporting to act on behalf of [GSD], borrowed $2,977,777.78 from Miller Bates, LLC ('Miller Bates'). The loan closed on December 30, 2020 and was secured by a deed of trust on a GSD property (the 'Miller Bates Loan')." Lai and Miller Bates agreed that "Chicago Title Company of Washington"[2] would "provide escrow closing services to close the Miller Bates loan to GSD and issue a lender's title insurance policy to Miller Bates, and Chicago Title Insurance Company underwrote a lender's policy in favor of GSD upon closing." Lai produced documentation in support of his contention that he had the authority to take such actions on GSD's behalf, including "a fabricated GSD operating agreement," and "a GSD Manager's Certificate." The manager's certificate "was consistent with an Amended Annual Report filed [by GSD] with the Washington Secretary of State" which Chicago Title possessed from

---

[2] In FF 4, an unchallenged verity, the trial court noted, "Chicago Title Company of Washington and Chicago Title Insurance Company, [p]laintiffs in this action, are referred to collectively as 'Chicago Title.'" For consistency and clarity, we follow that naming convention here.

"closing GSD's 2018 acquisition of the property," the same property that was "pledged as security" for the loan from Miller Bates to GSD.

"In December 2020, [Keeley] learned that [Lai] intended to obtain a loan and use the proceeds to pay off the Essig Judgment." Notably, Keeley also learned, after speaking to "Jason Li, a representative of GSD, that GSD 'had nothing to do with Mr. Lai at all'" and Lai had no authority to borrow on behalf of GSD or encumber its real property assets.[3] Then, Lai,

> in answering the Second Essig Lawsuit on January 12, 2021, asserted as an affirmative defense that he had deposited $710,000 in the King County Superior Court registry to satisfy the Essig Judgment. Brian Keeley, as attorney for David Essig, moved for disbursement of $710,000 from the court registry to satisfy the Essig Judgment on January 15, 2021, without giving notice to Miller Bates or Chicago Title, and the $709,990 in proceeds from the Miller Bates Loan was disbursed to Brian Keeley's firm, in trust for David Essig, on February 4, 2021.

(Citation omitted.) Miller Bates later learned of Lai's fraud and "made a claim to Chicago Title under its lender's policy with Chicago Title Insurance Company." Chicago Title retained counsel on behalf of Miller Bates who then "sued Michael Lai, GSD, Jason Li, and others for declaratory relief as to the validity of the loan and deed of trust." Miller Bates obtained a judgment and assigned it to Chicago Title as it had "incurred a loss of $2,977,777.78 under the lender's policy." Counsel for Chicago Title, Rick Spoonemore, then traced the funds that Lai had received from Miller Bates and discovered that Lai had used them to satisfy Essig's judgment against him.

---

[3] Essig's briefing and some portions of the record transmitted on appeal spell Li's last name as "Lee." However, evidence contained in the record clearly establishes that "Li" is the proper spelling.

- 3 -

In January 2024, Chicago Title filed a complaint against Essig and sought the equitable remedy of a constructive trust. In its complaint, Chicago Title alleged that

> Essig, and his agents and attorneys, knew Michael Lai had received funds from the Miller Bates Loan, had pledged [GSD] property to secure the Miller Bates Loan, and lacked authority to act for [GSD] to execute the [GSD] Deed of Trust. David Essig, and his agents and attorneys, knew or should have known in light of information [GSD] communicated to David Essig and his agents and attorneys, the $710,000 in funds paid by Michael Lai to satisfy the Essig Judgment was wrongfully obtained from Miller Bates, directly and proximately causing loss to Miller Bates and Chicago Title.

Chicago Title argued that Essig had benefited and been enriched because he received a portion of "the improperly obtained Miller Bates Loan proceeds," the funds Lai had obtained from the Miller Bates loan under false pretenses and without the appropriate authority. Chicago Title further averred that "it would be unjust for David Essig to retain the benefits he received from the improper Miller Bates Loan proceeds" and Essig was therefore unjustly enriched to the detriment of Chicago Title. Chicago Title claimed that this justified the imposition of a constructive trust on equitable grounds because Essig had taken the funds, kept them, and "would be unjustly enriched if he were permitted to retain" them. Chicago Title also asserted that "Essig and his agents and attorneys knew, or should have known," that Lai had obtained the funds through "false pretenses and without authority to act" on behalf of GSD because GSD had communicated this to Essig and also because of Lai's general past history of dishonesty. Its complaint requested that the trial court order Essig to

> immediately repay all funds received by him from Michael Lai through the Miller Bates Loan and indemnify Chicago Title for payments

- 4 -

made to Miller Bates under the [l]oan [p]olicy by imposition of constructive trust in favor of Chicago Title in the corpus amount of $710,000 plus interest from the date of Michael Lai's payment of Miller Bates Loan proceeds to David Essig in partial satisfaction of the Essig Judgment through the date of entry of judgment in this action.

Chicago Title also sought "pre-judgment interest" and an award of "attorney fees and costs pursuant to RCW 4.84.185 and common law."

Essig's answer followed in April and consisted primarily of general denials, although he did admit to "transacting business with Michael Lai and obtaining a judgment against Lai." Essig also asserted an affirmative defense, relevant to this appeal, that the "doctrine of unclean hands" should bar Chicago Title's claims.[4]

On December 27, Essig filed a motion for summary judgment dismissal of Chicago Title's suit. In the motion, Essig recounted the history of his dealings with Lai, as well as Keeley's conversations with Li regarding GSD and the loan. Essig presented a number of exhibits and supporting declarations, including his own and those from Keeley and his present counsel, with his motion. On January 13, 2025, Chicago Title filed its opposition to Essig's motion and offered exhibits and declarations from its counsel in the previous litigation against Lai, an employee, and counsel in the present case. After a hearing on Essig's motion, the trial court entered an order on February 12 that denied summary judgment and set a pretrial conference.[5]

---

[4] Essig's other affirmative defenses were that Chicago Title had failed "to state a claim for which relief may be granted," its claim was barred "by the statute of limitations and/or laches," GSD's receipt of notice of the funds Lai had placed into the court registry to satisfy the judgment justified application of the doctrines of "[e]stoppel and/or waiver," Chicago Title had "failed to join a person need[ed] for just adjudication pursuant to CR 19," Chicago Title's "own negligence" was "the source of loss it incurred" because it failed "to perform its due diligence," and liability for Chicago Title's loss rested with third parties.

[5] The February 12, 2025 order was not appealed.

In March 2025, the court conducted a three-day bench trial over Zoom.[6] On the first day, the trial court heard testimony from Chicago Title's prior counsel, Spoonemore, who had pursued the judgment against Lai on behalf of Miller Bates, and two employees of Fidelity Investments, the parent company of Chicago Title. Essig presented Keeley's testimony the following day and his own on the third and final day of trial. At the conclusion, the judge summarized his findings of fact (FF) that supported his conclusions of law (CL) and ultimately held both that Essig failed to carry his burden to establish, on a preponderance of the evidence standard, his affirmative defense of unclean hands and Chicago Title had proven by clear, cogent, and convincing evidence that the equities entitled it to a constructive trust over the funds Essig had received from Lai. The trial judge entered the written findings and conclusions roughly a week and a half later on March 28. On April 21, Chicago Title presented a motion for entry of judgment pursuant to the trial court's findings and conclusions which the court later granted on May 13.

Essig timely appealed.

ANALYSIS

I.      Standard of Review and Scope of Appeal

In his opening brief, Essig assigns error to four of the trial court's conclusions of law: CLs 3, 4, 5, and 6. However, he has not challenged any of the underlying findings of fact entered after the bench trial. "We review a trial court's decision following a bench trial by asking whether substantial evidence supports the findings and whether the findings support the court's conclusions of law."

---

[6] "Zoom" is a software application commonly used for videoconferencing.

*Casterline v. Roberts*, 168 Wn. App. 376, 381, 284 P.3d 743 (2012). "Unchallenged findings of fact are verities on appeal. Unchallenged conclusions of law become the law of the case." *Rush v. Blackburn*, 190 Wn. App. 945, 956, 361 P.3d 217 (2015) (citation omitted). We review questions of law de novo. *Pardee v. Jolly*, 163 Wn.2d 558, 566, 182 P.3d 967 (2008). If some findings are actually conclusions or are mixed findings and conclusions, "we review the factual components under the substantial evidence standard and the conclusions of law, including those mistakenly characterized as findings of fact, de novo." *In re Est. of Haviland*, 162 Wn. App. 548, 561, 255 P.3d 854 (2011).

Critically, Essig has consistently also failed to identify that some of the conclusions of law he challenges are truly mixed statements of fact and law, much less apply the relevant standard of review. Accordingly, all the unchallenged findings entered after the bench trial are verities, and the remaining unchallenged conclusions of law are the law of the case. *See Rush*, 190 Wn. App. at 956.

II.    Challenges to Findings of Fact and Conclusions of Law

Essig seeks reversal of the trial court's resolution of the bench trial as to the facts it ultimately found based on the evidence presented and its legal conclusions regarding equitable remedies and affirmative defenses. Because he presents those challenges by assignment of error to specific conclusions of law entered after trial, we analyze his claims under the standards of review set out in Part I, *supra*.

A. Knowledge of Lai's Fraud and Imputation

Essig challenges CLs 3 and 4, which both go to the question of knowledge regarding Lai's fraud as to the Miller Bates loan secured by the GSD property and imputation of that knowledge from an agent, Keeley as Essig's attorney, to their principal Essig as Keeley's client. We consider each in turn.

1. Unchallenged Findings Support Conclusion about Keeley's Knowledge

Essig assigns error to the trial court's conclusion of law regarding Keeley's knowledge that Lai acted fraudulently in order to obtain the loan from Miller Bates, CL 3, which is actually a mislabeled finding of fact. However, he fails to acknowledge, much less apply, case law that directs us to consider findings and conclusions for what they are, rather than how they are labeled, nor does he engage in the substantial evidence test relevant to a trial court's findings.[7] Chicago Title correctly identifies this discrepancy in its brief and contends that the trial court did not err in entering it. Chicago Title is correct.

A finding of fact is an "'assertion that a phenomenon has happened or is or will be happening independent of or anterior to any assertion as to its legal effect.'" *Leschi Improvement Council v. Wash. State Highway Comm'n*, 84 Wn.2d 271, 283, 525 P.2d 774 (1974) (internal quotation marks omitted) (quoting *Nat'l Lab.*

---

[7] In fact, in the second sentence of the section of his brief on the "Standard of Review," Essig states the "appellate court reviews a trial court's fact-based rulings for abuse of discretion" and offers a criminal case in support of that proposition.

However, in response to questioning by the panel at oral argument before this court, Essig agreed that the proper standard of review is substantial evidence for findings of fact and de novo review of conclusions of law. Wash. Ct. of Appeals oral arg., *Chicago Title Ins. Co. v. Essig*, No. 88284-8-I (Mar. 3, 2026), at 1 min., 44 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2026031135/.

*Rels. Bd. v. Marcus Trucking Co.,* 286 F.2d 583, 590 (2d Cir. 1961)). CL 3 reads as follows:

> Acting as attorney and agent for Defendant David Essig, Brian Keeley learned Michael Lai borrowed $2,977,777.78 from Miller Bates, falsely purporting to be authorized by GSD, Michael Lai lacked authority to enter the Miller Bates Loan on behalf of GSD, and Michael Lai used the loan proceeds from the Miller Bates Loan, in part, to satisfy the Essig Judgment.

While Essig does contest some of the content of CL 3, he does not assert it is unsupported by substantial evidence but, rather, that the trial court erred because it improperly found that "Essig had a duty to notify Miller Bates or possibly Chicago Title [because it] assumes that Essig knew Lai had committed actual fraud at this point in time." However, the trial court made no such finding, in CL 3 or elsewhere.[8] Even if Essig had properly framed his challenge to CL 3, it would not be meritorious. This is because Essig himself offered as exhibits e-mails in which Keeley expressly acknowledged that Lai was obtaining a loan to satisfy the judgment he owed to Essig, Lai had used the property of GSD as the collateral for the loan in question, and Lai lacked the authority to borrow on behalf of GSD. The trial court relied on these exhibits, and explicitly referenced them, in FFs 7 through 9, which are, again, unchallenged and therefore verities. Essig has failed to demonstrate error as to CL 5.

---

[8] The closest the trial court came to making such a determination is found in FF 11 and CL 5, both analyzed in detail in Section I.C, *infra*. Neither FF 11 or CL 5 reflects a decision by the trial court that Essig had a legal duty, but each serves as a part of the larger equitable considerations on which the court based its decision to impose the constructive trust.

2.    Keeley's Knowledge Was Properly Imputed to Essig

Essig next assigns error to CL 4 and contends in briefing that the "trial court incorrectly weighed the December 2, 2020 e[-]mail from [Li] to attorney Keeley as further supporting its determination that Essig had knowledge" of Lai's fraudulent conduct.   Chicago Title responds that Keeley's knowledge is imputed to Essig "because that information was learned by Brian Keeley within the course and scope" of his legal representation of Essig and their agency relationship.  Chicago Title is correct.

To reiterate, we review the component parts of mixed findings of fact and conclusions of law for substantial evidence and de novo respectively.  *Haviland*, 162 Wn. App. at 561.  Further, when engaging in substantial evidence review, this court does not consider whether it would reach the same finding based on the evidence before the trial court but, rather, reaches only the question of whether substantial evidence supports the finding the court reached.  *Pardee*, 163 Wn.2d at 566.  We do not revisit the trial court's credibility determinations.  *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003).

Essig's briefing again fails to identify or engage with the fact that CL 4 is a mixed statement of fact and law, and he disputes many of the underlying facts set out therein without argument of the standard of review for substantial evidence. CL 4 states,

> An agent attorney's knowledge is imputed to the principal client if the knowledge is relevant to the agency relationship.  *Kelsey Lane Homeowners Ass'n v. Kelsey Lane Co.*, 125 Wn. App. 227, 235, 103 P.3d 1256 (2005).  Brian Keeley's knowledge of the Miller Bates Loan, Michael Lai's intent to use proceeds from the Miller Bates Loan to satisfy the Essig Judgment, and Michael Lai's obtaining the Miller

> Bates Loan through fraud and without proper authority to act on behalf of GSD, is imputed to Defendant David Essig because that information was learned by Brian Keeley within the course and scope of Brian Keeley's legal services provided to David Essig and within Brian Keeley's agency relationship for David Essig. Moreover, David Essig was directly aware that Michael Lai planned to use the Miller Bates Loan proceeds to satisfy the Essig Judgment, and that Michael Lai borrowed $2,977,777.78 purportedly for GSD, lacking authority for GSD, because he obtained the Deed of Trust himself and he received the January 5, 2021 Brian Keeley e[-]mail that contained Jason Li's statement that Michael Lai "has nothing to do with" GSD. *See Plaintiffs' Exhibit 1 at 5; Defendant's Exhibit 22.*

Essig does not provide authority contrary to the case cited and relied on by the trial court in CL 4 or assert that the trial court made an incorrect legal conclusion when it imputed Keeley's knowledge of Lai's actions to Essig. With regard to the portion of CL 4 that is actually a finding of fact, the trial court expressly cited the evidence it relied on toward that end: "*See Plaintiffs' Exhibit 1 at 5; Defendant's Exhibit 22.*"

At oral argument before this court, Essig clarified that his challenge was to "whether there was any actual knowledge at all,"[9] effectively circling back to his challenge to the content of CL 3. However, that does not avail him because, as explained in Section II.A.1, *supra*, the findings contained in CL 3 are amply supported by evidence Essig put before the court. To the extent Essig challenges the *weight* the trial court gave the evidence of the December 2 e-mail from Li to Keeley, that contention fails because we do not reweigh evidence on appeal. *See Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009). However, in addition to that independent barrier to relief and as with his challenge to CL 3, Essig has not assigned error to any of the substantially similar

---

[9] Wash. Ct. of Appeals oral arg., *supra*, at 2 min., 31 sec.

- 11 -

findings of fact entered by the trial court, FFs 7 through 9 described in Section II.A.1, *supra*, rendering them verities on appeal.

As to the legal conclusion in CL 4 regarding the imputation of Keeley's knowledge of these facts to Essig, the trial court cited *Kelsey Lane Homeowners Ass'n,* 125 Wn. App. at 235, for the proposition that an "agent attorney's knowledge is imputed to the principal client if the knowledge is relevant to the agency relationship." In *Kelsey Lane Homeowners Ass'n*, the association sued over extensive water damage to its members' condominiums and alleged that the company who built them had fraudulently concealed defects in the building which led to the damage. *Id.* at 231. This court declined to apply the law of agency to impute the knowledge of the independent contractors to the company that hired them because their agreement explicitly delegated responsibility to oversee the construction to the contractor. *Id.* at 237. We reasoned that without the ability to exercise control, the company was not a principal and the contractor was not its agent. *Id.* at 238. We held that knowledge can only be imputed from an agent to its principal if that knowledge is "relevant to the agency relationship." *Id.* at 235. In so holding, we relied on our earlier opinion, *Goodman v. Boeing Co.*,[10] which in turn relied on the *Restatement (Second) of Agency* § 268 cmt. c (AM. LAW INST. 1958) for that proposition. *Kelsey Lane Homeowners Ass'n*, 125 Wn. App. at 235. Essig offers no argument regarding this statement of the law, and the trial court did not err when it relied on this authority or its application to these facts. Therefore, he does not prevail on this assignment of error.

---

[10] 75 Wn. App. 60, 85, 877 P.2d 703 (1994), *aff'd,* 127 Wn.2d 401, 899 P.2d 1265 (1995)).

The trial court's findings regarding Keeley's knowledge of Lai's fraudulent conduct in obtaining the funds to satisfy Essig's judgment against him, specifically that Lai acted without authority of GSD to obtain a loan secured by GSD property, are supported by substantial evidence. The trial court further applied controlling authority to those facts and properly concluded that Keeley's knowledge of Lai's fraud could be imputed to Essig because this knowledge was "relevant to the agency relationship" between them as attorney and client for the purposes of collection on a judgment.

B.    Unjust Enrichment and Constructive Trust

Another key challenge Essig presents goes to the trial court's determinations regarding unjust enrichment and the legal propriety of the equitable remedy of a constructive trust. Toward that end, Essig assigns error to CLs 5 and 6.

As to CL 5, Essig contends that the trial court erred when it concluded he was unjustly enriched when he received the funds from Lai because his "actions in obtaining the funds from the [c]ourt [r]egistry were lawful and appropriate." He further avers that the imposition of a constructive trust was not supported by clear, cogent, and convincing evidence because there was "no evidence" of his wrongdoing. Chicago Title disagrees and avers that the "trial court properly found that admissible evidence and testimony established [Essig's] taking of $710,000 to satisfy the Essig judgment was unjust enrichment" and, further, that this fact "provides a proper basis for imposition of a constructive trust over" the funds. We agree with Chicago Title.

"[T]he question of whether equitable relief is appropriate is a question of law" that we review de novo. *Niemann v. Vaughn Cmty. Church*, 154 Wn.2d 365, 374-75, 113 P.3d 463 (2007). "In matters of equity, 'trial courts have broad discretionary power to fashion equitable remedies.'" *Sorenson v. Pyeatt*, 158 Wn.2d 523, 531, 146 P.3d 1172 (2006) (quoting *In re Foreclosure of Liens*, 123 Wn.2d 197, 204, 867 P.2d 605 (1994)). The authority of the trial court to fashion equitable remedies is reviewed for abuse of discretion. *Id.*

### 1.  Essig Was Unjustly Enriched by Lai's Fraud

Essig contends as a starting point that he was not unjustly enriched when the funds were disbursed to him from the superior court registry because "Chicago Title never conferred any benefit upon Mr. Essig" and "Essig and Chicago Title, or its insured Miller Bates, never transacted business." We disagree.

"The equitable theory of unjust enrichment is rooted in notions of fairness and justice. It is 'the method of recovery for the value of the benefit retained absent any contractual relationship.'" *Nwauzor v. Geo Grp., Inc.*, 2 Wn.3d 505, 525, 540 P.3d 93 (2023) (quoting *Young v. Young*, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008)). "A benefit includes any form of advantage." *Irwin Concrete, Inc. v. Sun Coast Props., Inc.*, 33 Wn. App. 190, 194, 653 P.2d 1331 (1982). A transaction the law does not support is voidable. *Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d 173, 187, 157 P.3d 847 (2007). "'Unjustified enrichment is enrichment that lacks an adequate legal basis: it results from a transfer that the law treats as ineffective to work a conclusive alteration in ownership rights.'" *Id.* at 187-88 (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT

§ 1 cmt. b at 3 (AM. LAW INST. Discussion Draft 2000)). "A party must make restitution where it has been unjustly enriched at the expense of another." *Seattle Mortg. Co. v. Unknown Heirs of Gray*, 133 Wn. App. 479, 498, 136 P.3d 776 (2006). But benefit alone is "not enough to require restitution and liability attaches only when the circumstances of the benefit would make it unjust to keep it." *Id.*

Here, the trial court's conclusion regarding unjust enrichment is set out in CL 5, which reads,

> The circumstances created by Mr. Keeley, as attorney and agent for Mr. Essig, following discovery of the fraudulent Miller Bates Loan, make it unjust for Mr. Essig to retain the $709,990 he took from the Miller Bates Loan proceeds. Knowing the Miller Bates Loan proceeds had been obtained by Michael Lai, knowing that Michael Lai lacked authority to borrow on behalf of GSD, and knowing Michael Lai used the fraudulent Miller Bates Loan proceeds to satisfy the Essig Judgment, Brian Keeley and David Essig failed to notify Miller Bates the loan was fraudulent, failed to notify Miller Bates of Michael Lai's deposit of loan proceeds in the court registry, and failed to give notice of the motion to disburse court registry funds or the disbursement on February 1, 2021. *These circumstances constitute clear, cogent, and convincing evidence that it would be unjust for David Essig to retain the $709,990 he moved for disbursement of, and received, from the fraudulently obtained Miller Bates Loan*.

(Emphasis added.) In *Farwest Steel Corp. v. Mainline Metal Works, Inc.*, this court considered the question of whether a third party uninvolved in the original transaction was unjustly enriched at the expense of the plaintiff. 48 Wn. App. 719, 731, 741 P.2d 58 (1987). There, the third party benefitted from the performance of an agreement to which it was not a party, and the plaintiff suffered a loss. *Id.* at 732-33. On the specific facts presented in that case, we concluded the third party had not been unjustly enriched but also clarified the circumstances where unjust enrichment could occur. *Id.* at 732-33. If the third party had contributed to

the loss suffered in the original transaction, either by acquiescence or by misleading the harmed party, then it would be unjust for the third party to retain the benefit it had received. *Id.* This is the exact scenario of the case at bar.

It is undisputed that Essig was not a party to the loan transaction between Lai and Miller Bates, Essig acquiesced to Lai's fraud by not informing Miller Bates or Chicago Title that Lai was obtaining the loan without the requisite authority despite the knowledge properly imputed to him, Essig received a benefit when he sought disbursement of the funds Lai had placed in the court registry, and Chicago Title suffered a loss as a result. Accordingly, even though Essig was a third party to the fraudulent transaction between Lai and Miller Bates, it would be unjust for him to benefit as a result of that transaction, particularly when he knew that Lai defrauded Miller Bates in order to satisfy the judgment he owed to Essig. The trial court did not err when it concluded that Essig was unjustly enriched, despite the fact that he was not a party to the fraudulent loan transaction between Lai and Miller Bates and Chicago Title did not directly confer a benefit to him.

2.      Constructive Trust in Favor of Chicago Title Is Proper

While he does not present an assignment of error to challenge the conclusion of law that Chicago Title is entitled to a constructive trust as a matter of equity, CL 7, he presents this argument through his assignments of error to CLs 3 through 5, which provide the legal foundation for the equitable remedy. He contends that because there was no knowledge of fraud to impute to Essig and Essig did not directly participate in the fraudulent loan transaction such that he could not be found to have been unjustly enriched, there is no factual basis on

which to impose the constructive trust. He further asserts that a constructive trust may not be imposed absent "some wrongdoing" by the party against whom it is imposed. Toward that end, he argues in his reply brief that the trial court erred by "finding" there was an "equitable base" to impose the constructive trust because it relied on "Chicago Title's speculative evidence of wrongdoing based on two contested e[-]mails." We disagree with both his characterization of the controlling law regarding evidence of wrongdoing and the court's findings.

Our Supreme Court defined the circumstances that justify the imposition of a constructive trust as follows:

> "Where for any reason the legal title to property is placed in one person under such circumstances as to make it inequitable for [them] to enjoy the beneficial interest, a trust will be implied in favor of the persons entitled thereto. This arises by construction of equity, independently of the intention of the parties. Equity will raise a constructive trust and compel restoration where one through actual fraud, abuse of confidence reposed and accepted, or through other questionable means gains something for [themselves] which, in equity and good conscience, [they] should not be permitted to hold."

*Scymanski v. Dufault*, 80 Wn.2d 77, 88-89, 491 P.2d 1050 (1971) (quoting *Seventh Elect Church v. First Seattle Dexter Horton Nat'l Bank*, 162 Wn.2d 437, 440, 299 P. 359 (1931)). Significantly, the court went on to explain that a "constructive trust may arise *even though acquisition of the property was not wrongful*. It arises where the retention of the property would result in the unjust enrichment of the person retaining it." *Id.* at 89 (emphasis added). "Indeed, the primary purpose of a constructive trust is to prevent unjust enrichment." *Consulting Overseas Mgmt., Ltd. v. Shtikel*, 105 Wn. App. 80, 87, 18 P.3d 1144 (2001). "Clear, cogent, and convincing evidence must support 'the basis for impressing the trust.'" *Ames v.*

*Ames*, 184 Wn. App. 826, 851, 340 P.3d 232 (2014) (quoting *Baker v. Leonard*, 120 Wn.2d 538, 547, 843 P.2d 1050 (1993)).  Clear, cogent, and convincing evidence is "the quantum of evidence sufficient to convince the fact finder that the fact in issue was 'highly probable.'"  *Tiger Oil Corp. v. Yakima County*, 158 Wn. App. 553, 562, 242 P.3d 936 (2010) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

As with his other challenges to the trial court's conclusions of law, Essig does not identify CL 5 as a mixed finding of fact and conclusion, engage with the relevant standard of review, or acknowledge the other unchallenged findings that support the court's ultimate conclusion on this point.  Procedural deficits aside, this claim fails because there is clear, cogent, and convincing evidence to support the imposition of a constructive trust.

It is undisputed that the financial loss to Chicago Title was not caused by any fraudulent or wrongful conduct by Essig or Keeley.  As our Supreme Court has instructed, while wrongdoing is one manner that may support the imposition of a constructive trust on a party who has used fraud to procure a benefit, fraudulent conduct by the person who would retain the benefit is simply not required.  *See Scymanski*, 80 Wn.2d at 88-89.  Further, the primary purpose of the constructive trust is to prevent unjust enrichment.  *Consulting Overseas Mgmt.*, 105 Wn. App. at 86-87.  As explained, *supra*, there are unchallenged findings of fact that support the trial court's conclusion that Essig obtained a benefit when he actively sought disbursement of the fraudulently obtained funds from the court registry (FF 9) and Essig was removed from the loan transaction between Lai and Miller Bates as a

knowing, but acquiescent, third party (FF 8). These factual findings fit within the legal framework established by appellate authority. *See Nwauzor*, 2 Wn.3d at 525; *Farwest Steel Corp.*, 48 Wn. App. at 732-33.

As he did in the trial court, Essig relies on *Baker v. Leonard*, to the exclusion of other controlling precedent, to support his contention regarding the requirement of wrongdoing. However, his insistence simply does not make it so.

Baker, the estate administrator, sought a constructive trust over funds Leonard withdrew from a checking account with right of survivorship jointly held by the deceased and Leonard. *Baker,* 120 Wn.2d at 540. Our state Supreme Court held that under the statute in effect at the time, "legal title to the account funds" had vested in Leonard. *Id.* at 546. Baker's contention was that a constructive trust was justified "even though the acquisition of legal title to the property was not wrongful," and he cited *Scymanski* in support of this proposition. *Id.* at 548. Our Supreme Court distinguished *Scymanski* from Baker's case: "[I]n *Scymanski*, the holder of legal title subject to the constructive trust had 'intentionally interfered with another's business relationship and as a result of such interference ha[d] acquired property that was the subject of that relationship'" and the constructive trust had been imposed on that property. *Id.* (some alteration in original) (quoting *Scymanski*, 80 Wn.2d at 89). However, at no point did the *Baker* court hold that *Scymanski* was no longer good law, and Essig conceded at oral argument before this court that he knew of no authority that has held *Baker* abrogated *Scymanski*.[11] Critically to that point, the *Baker* court reiterated a different prior holding that

---

[11] Wash. Ct. of Appeals oral arg., *supra*, at 6 min., 56 sec.

constructive trusts can still be imposed when "there has been no evidence of fraud or wrongdoing." *Id.* It further went on to explain that "[w]rongdoing, however, is not confined to a particular category, such as fraud, misrepresentation, or bad faith" despite the fact that conduct falling into one of those categories often "forms the basis for imposition of a constructive trust." *Id.* Wrongdoing, even broadly defined as in *Baker*, is simply not a requirement for the imposition of a constructive trust but, rather, *an* equitable basis that could support the equitable remedy as appropriate.

Finally, Essig also asserts that the "only potential 'wrongdoing' the trial court found committed by Essig was a failure to notify Miller Bates or Chicago Title of Lai's fraudulent actions." The plain language of *Baker* and *Scymanski* aside, this contention would also fail in light of a number of other unchallenged findings that are now verities and sufficient to satisfy the clear, cogent, and convincing standard of proof. For example, unchallenged FF 11 states,

> Attorney Rick Spoonemore testified at trial that he tracked Michael Lai's receipt of the Miller Bates Loan proceeds into a U.S. Bank account, and from there to the Cathay Bank cashier's check deposit into the King County Superior Court registry on January 11, 2021. *See Plaintiffs' Exhibit 4, Defendant's Exhibit 26. The [c]ourt found that testimony credible and unrebutted by any evidence.* Rick Spoonemore acknowledged in his trial testimony, and the [c]ourt finds, that Mr. Keeley performed an impressive job of obtaining Michael Lai['s] asset, liability, and entity affiliation information to assist in enforcing the Essig Judgment against Michael Lai and entities affiliated with Michael Lai. *Mr. Keeley's trial testimony concerning why he chose not to inform Miller Bates of Mr. Essig's motion to disburse proceeds on deposit with the court registry, however, lacks credibility, as does his testimony that he did not believe Mr. Li's statements that Michael Lai lacked authority to sign the Miller Bates Loan documents on behalf of GSD.* Mr. Keeley testified he did not believe Miller Bates was a victim of the unauthorized Miller Bates Loan. Mr. Keeley, however, knew Miller

> Bates had loaned $2,977,777.78 and that Michael Lai received the proceeds of that loan reportedly without authority, so that Miller Bates stood to lose the loaned funds and any security for the Miller Bates Loan. A careful attorney should have given Miller Bates notice of Mr. Essig's motion to disburse the proceeds deposited by Michael Lai into the court registry. *Mr. Keeley and Mr. Essig had notice of Michael Lai's repeated wrongdoing, including breaching his employment agreement with Mr. Essig, failing to satisfy the Essig Judgment for several years, entering into a December 1, 2020 settlement agreement and failing to perform, multiple fraudulent conveyances as Mr. Essig alleged in the Second Essig Lawsuit, and at least four independent statements by Jason Li that Michael Lai lacked authority to sign any document for GSD (see Defendant's Exhibits 63, 13, 14, 22, 24). Mr. Keeley's testimony to the effect that he did not believe Mr. Li's repeated statements that Michael Lai lacked authority to take the Miller Bates Loan is devoid of credibility.*

(Some emphasis added.) Notably, there are credibility determinations in this finding that are not subject to our review. *See Morse*, 149 Wn.2d at 574. Beyond that, even if Essig had challenged this finding, the trial court specifically noted the evidence that it relied on in resolving the facts contained therein. This uncontested finding supports the trial court's conclusion that clear, cogent, and convincing evidence established the propriety of this equitable remedy to Chicago Title because allowing Essig to retain the fraudulently obtained loan funds would result in his unjust enrichment, as explained in Section II.B.1, *supra*. On these facts, CL 5 logically follows the law regarding the equitable remedy of a constructive trust and the court's imposition of that remedy was proper.

C.     Essig's Affirmative Defense of Unclean Hands

Finally, Essig avers that the trial court further erred when it concluded that he did not meet the necessary evidentiary burden for his affirmative defense of unclean hands. This is so, he contends, because the trial court relied on *Parker v.*

- 21 -

*Title & Trust Co.*, 233 F.2d 505, 509 (9th Cir. 1956), to conclude "that negligence in order to bar equitable relief must be so gross and inexcusable to amount to a positive violation of a legal duty on the part of the complaining party." Essig asserts that this standard was too high and the *Parker* holding rested on factual details not present here. He further relies on *Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.*, 890 F.2d 165 (9th Cir. 1989), to argue that the "doctrine of unclean hands bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct." Chicago Title, in response, asserts that Essig did not introduce "any admissible evidence of standards in the title insurance industry or breach of such standards," other evidence established that Chicago Title "exercised reasonable care" in closing and insuring the loan, and, therefore, the trial court did not err when it concluded that Essig failed to carry his burden of proof as to the affirmative defense he asserted. Chicago Title is correct.

Again, we consider de novo whether an equitable remedy is proper. *Niemann*, 154 Wn.2d at 374. "'It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court [they] must first show. . . a good and meritorious cause of action'" and "'[they] must come into the court with clean hands.'" *J.L. Cooper & Co. v. Anchor Sec. Co.*, 9 Wn.2d 45, 71-72, 113 P.2d 845 (1941) (quoting 1 JOSEPH STORY & W.H. LYON JR., COMMENTARIES ON EQUITY JURISPRUDENCE § 98 (14th ed. 1918)); *see also Miller v. Paul M. Wolff Co.*, 178 Wn. App. 957, 965, 316 P.3d 1113 (2014) ("It is well settled that a party with unclean hands cannot recover in equity."). The party who raises the doctrine of unclean hands has "the burden of proof as to this

affirmative defense." *Grp. Health Co-op of Puget Sound v. King County Med. Soc'y*, 39 Wn.2d 586, 662, 237 P.2d 737 (1951). Generally, "the lowest standard, preponderance of the evidence, applies to civil actions." *Loun v. U.S. Bank Nat'l Ass'n*, 26 Wn. App. 2d 228, 237, 525 P.3d 1280 (2023). This requires demonstrating that the facts are "more likely than not, or more than 50 percent." *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 608, 260 P.3d 857 (2011). The affirmative defense that an equitable remedy is unavailable due to unclean hands must be proven by a preponderance of the evidence. *See Sappington v. Owens*, 92 Wash. 632, 635, 159 P. 785 (1916). "Recovery in restitution to which an innocent claimant would be entitled may be limited or denied because of the claimant's inequitable conduct in the transaction that is the source of the asserted liability." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 63 (AM. LAW INST. 2011).

The party seeking a remedy "'ought not to be the transgressor'" and then complain that they have "'been injured on account of [their] own wrongful misconduct.'" *J.L. Cooper*, 9 Wn.2d at 72 (quoting 1 STORY, *supra,* § 98)). Even if that party sustains "'the greater injury by reason of [their] inequitable scheme or plan, [they] ought to bear the burden and the consequences of [their] own folly.'" *Id.* (quoting 1 STORY, *supra,* § 98). However, a degree of responsibility for the claimed injury is not an absolute bar to equitable relief.[12] *Id.* at 73. To deny relief

---

[12] In *J.L. Cooper*, our Supreme Court explained this as follows:

"It is not every time that one has practiced an unconscionable bargain upon another, or there has been a lack of good faith and those matters that are usually present when men deal with each other at arm's length, and the parties are capable of protecting themselves and their own rights, that a court of equity will refuse its aid to a complaining party. It is only where the inequitable conduct complained of as ground for refusing its jurisdiction has actually been practi[c]ed

on this basis, that culpable conduct "'must have an immediate and necessary relation to the equity'" sought. *Id.* (quoting 1 STORY, *supra,* § 100). "Fraud or inequity practiced against a third person, who does not complain, does not close the doors of equity to a plaintiff guilty of no inequity as against a defendant." *McKelvie v. Hackney,* 58 Wn.2d 23, 32, 360 P.2d 746 (1961). A relevant treatise instructs that, "[a] person who has conferred a benefit upon another by mistake is not precluded from maintaining an action for restitution by the fact that the mistake was due to [their] lack of care." RESTATEMENT OF RESTITUTION § 59 (AM. LAW INST. 1937). Our state Supreme Court favorably quoted substantially similar language that also relied on the *Restatement of Restitution* § 59, when it considered the application of this equitable principle in the context of subrogation. "'If all persons who negligently confer an economic benefit upon another are disqualified from equitable relief because of their negligence, then the law of restitution, which was conceived in order to prevent unjust enrichment, would be of little or no value.'" *Bank of Am., NA v. Prestance Corp.*, 160 Wn.2d 560, 568, 160 P.3d 17 (2007) (quoting *Ex Parte AmSouth Mortgage*, 679 So. 2d 251, 255-56 (Ala. 1996)).

---

with reference to the matter then under consideration in the case at bar. It may happen that one who habitually takes an undue advantage over his customers in their business dealings, and this is a matter of common observation, at some times in his experience has dealt fairly and justly with his customers, and in the absence of evidence of an unconscionable advantage take in the very case at bar, it is no ground for refusing jurisdiction, that the general character and conduct of the complainant has been tainted with fraudulent and unfair practice. The principle does not repel all sinners from courts of equity, nor does it disqualify any claimant from obtaining relief there who has not dealt unjustly in the very transaction concerning which he complains. The inequity which will repel him must have an immediate and necessary relation to the equity for which he sues. It must be understood to be willful misconduct in regard to the matter in litigation and not to misconduct, however gross, which is unconnected therewith, and with which the opposite party in the cause has no concern."

9 Wn.2d at 72-73 (quoting 1 STORY, *supra,* §§ 100, 102).

The trial court's ruling on this point is primarily contained in CL 6, the focus of Essig's final assignment of error which suffers from the same procedural deficits regarding the relevant standard of review and supporting argument. CL 6 states,

David Essig asserted the affirmative defense that Chicago Title failed to exercise reasonable conduct and due diligence in verifying Michael Lai was authorized to execute the Miller Bates Loan, and continued to conduct business with entities affiliated with Michael Lai, and are therefore disqualified from equity under the doctrine of unclean hands. To prevail on the equitable disqualification defense, Defendant David Essig must prove by a preponderance of evidence that Chicago Title committed negligence causing its own loss "so gross and inexcusable as to amount to a positive violation of a legal duty on the part of the complaining party." *Parker v. Title & Trust Co.*, 233 F.2d 505, 509 (9th Cir. 1956) (citing *Restatement of Restitution* § 59). As stated above, Chicago Title reasonably relied upon the information in its possession in closing the Miller Bates Loan and in issuing and underwriting the lender's policy in favor of Miller Bates. Chicago Title exercised reasonable care in closing the Miller Bates Loan and insuring Miller Bates, and the evidence presented at trial, including but not limited to the Chicago Title Limited Liability Companies Authority Checklist (see Defendant's Exhibit 52) supports that Chicago Title complied with its internal procedures and requirements for confirming Michael Lai had authority to sign the Miller Bates Loan documents on behalf of GSD. Defendant David Essig failed to meet its [sic] burden of persuasion in establishing Chicago Title is disqualified from equity by reason of Chicago Title's conduct in closing the Miller Bates Loan, underwriting the Miller Bates lender's policy, or in conducting subsequent business with entities which may have been affiliated with Michael Lai.

Essig pursued this affirmative defense throughout the proceedings in the trial court but did so without reference to any legal authority. For example, Essig merely asserted in his answer to the complaint that the "doctrine of unclean hands bars [p]laintiff's claims," and he referenced the affirmative defense solely as a procedural fact in his motion for summary judgment. In his argument at the conclusion of the trial, he simply presented the evidence he believed supported his

- 25 -

affirmative defense but did not offer any authority to guide the trial court in its assessment of whether he had met his burden.

In contrast, Chicago Title cited *Parker* as persuasive authority in its response to Essig's motion for summary judgment, along with *Restatement of Restitution* § 59, to refute Essig's contention that it failed to exercise reasonable care and, on that basis, was precluded from obtaining the equitable relief it sought. On appeal, Essig disputes the trial court's application of this case but the persuasive authority he offers is distinguishable. *Parker*, by comparison, presents a similar factual scenario to the instant case and involves the same equitable principles.

In *Parker*, Title and Trust Company (TTC), an Oregon corporation, filed suit against two Washington residents regarding real property located in Oregon. 233 F.2d at 507-08. The Ninth Circuit, in reviewing that case from the District Court for the District of Oregon, explained that the suit was

> against the appellants Parker and Stegmann, citizens of the State of Washington, seeking, among other things, the cancellation of certain policies of title insurance issued by the company, based upon allegations that the Parkers had obtained the policies through fraudulent concealment of certain facts alleged to have been material to the risk assumed in the policies.

*Id.* at 507. The district court found that TTC was negligent because it failed to discover a defect in the title, and Parker averred on appeal to the Ninth Circuit "that this negligence prevents the company from claiming relief by way of cancelation." *Id.* at 509. The Ninth Circuit applied Oregon law, agreed that equitable relief was still available to the title company, and held that "'negligence, in order to bar equitable relief, in case of mutual mistake, clearly established, must be so gross

- 26 -

and inexcusable as to amount to a positive violation of a legal duty on the part of the complaining party.'" *Id.* (internal quotation marks omitted) (quoting *Wolfgang v. Henry Thiele Catering Co.*, 128 Or. 443, 444, 275 P. 33 (1929)).

Given the factual similarities and grounding of the holding in equitable principles, there is persuasive force to this nonbinding authority. *Parker* and the instant case both involve title companies that *could* have uncovered evidence of fraud that would have led them to halt a transaction. But neither company did so, in part, because the parties with that information chose to remain silent. Both Chicago Title and TTC sought relief from the party who had stayed silent and allowed the transaction to go forward to their own benefit and at the expense of the title company. In *Parker*, the Ninth Circuit upheld the district court's application of an equitable remedy; we uphold the trial court's application of the same remedy here.

The federal authority Essig offers, also from the Ninth Circuit, does not avail him, however, because it involves a factually distinct scenario than the one presented here. In *Dollar Systems*, a franchisee sought rescission of its contract with a franchisor. 890 F.2d at 168. The district court had declined to apply the doctrine of unclean hands to bar the franchisee from the equitable remedy of rescission. *Id.* at 173. It found the franchisee's performance of the agreement was "grossly negligent" but that its actions "did not rise to the level of misconduct necessary for the doctrine to apply." *Id.* On appeal, the Ninth Circuit affirmed and relied on California law to hold that the unclean hands doctrine bars "relief to a plaintiff who has violated conscience, good faith or other equitable principles in

[their] prior conduct, as well as to a plaintiff who has dirtied [their] hands in acquiring the right presently asserted." *Id.* Crucially, the franchisor's assertion that unclean hands precluded rescission was based on its claim that the franchisee had not performed its obligations pursuant to the contract. *Id.* In contrast, Essig has not claimed that Chicago Title failed to perform any agreement between them; indeed, he cannot, because as he emphasizes repeatedly, there was no contractual relationship between them. Because *Dollar Systems* is factually distinguishable, it does not control here.

However, we need not rest on federal authority here as we have binding precedent on this issue from our own state Supreme Court. In the consolidated case *McKelvie*, our Supreme Court reversed a trial court ruling that applied the unclean hands doctrine to a party in a real estate transaction, Edwards, based on her dealings with Hackney, another party to the transaction. 58 Wn.2d at 31-32. Hackney defrauded McKelvie in a separate but related transaction, and McKelvie sued Hackney based on fraud and misrepresentation. *Id.* at 28. Edwards had already filed a separate action against Hackney for specific performance to enforce an agreement they had made regarding stock and land interests related to a sale to McKelvie. *Id.* In her suit against Hackey, Edwards alleged that "he had acted as her agent and had induced her to enter into the action by fraud." *Id.* The trial court found that Edwards had unclean hands and, therefore, was not entitled to the equitable relief she sought because "of her acquiescence in Hackney's bilking of McKelvie." *Id.* Our Supreme Court disagreed; although Edwards had "acquiesced in Hackney's fraud on McKelvie," there was no claim "that [Edwards]

was in any way inequitable *in her dealings with Hackney*." *Id.* at 32 (emphasis added). Relying on its own precedent that dates back to 1915, it then held, as noted *supra*, that "[f]raud or inequity practiced against a third person, who does not complain, does not close the doors of equity to a plaintiff guilty of no inequity as against a defendant." *Id.* Essentially, inequities in dealings between Edwards and McKelvie were irrelevant to the trial court's consideration of Edwards' claims against Hackney. Our state's highest court plainly held that even if Edwards had harmed McKelvie indirectly by her involvement with Hackney, such conduct did not bar her from equitable relief as to Hackney.

Here, the application of this holding from *McKelvie* establishes that Essig cannot defend against Chicago Title's claim for equitable relief on the basis of its purportedly unclean hands with regard to its conduct in the loan transaction. Under *McKelvie*, this affirmative defense could only be raised against Chicago Title by a party who experienced inequity when Chicago Title insured the loan Miller Bates made to Lai. Essig was not a party to that transaction and spends a significant amount of his briefing emphasizing that very point. Further, the parties that *were* involved in that transaction, Lai, Miller Bates, and GSD, are not parties to this present action, and the trial court therefore properly concluded that this affirmative defense was not available. The relief sought by Chicago Title relates directly to Essig's receipt of funds that he knew were obtained by fraud and not to any possible deficiencies regarding its conduct in the Miller Bates loan transaction. There is not "'an immediate and necessary relation'" between the actions of

Chicago Title as to the completion of the loan and the equitable relief it pursued against Essig. *See J.L. Cooper*, 9 Wn.2d at 73 (quoting 1 STORY, *supra,* § 100).

Whether we apply *McKelvie* or *Parker*, as the trial court did here, only one outcome can be reached: the evidence Essig presented is insufficient to satisfy even the modest preponderance standard, either because he does not demonstrate, and in fact rejects, that he was a party to the transaction underlying his unclean hands affirmative defense or because he fails to establish the duties Chicago Title purportedly breached by its lack of reasonable care or due diligence. The court's conclusion as to his affirmative defense is proper under *McKelvie* based on the respective relationship of the parties; Essig simply did not, and likely could not, demonstrate that Chicago Title's hands were unclean as to *him*. If we apply the *Parker* opinion used at trial*,* we consider whether Essig produced evidence to establish "gross and inexcusable" negligence by Chicago Title that amounted to a violation of its legal duty. *See* 233 F.2d at 509. FF 6, unchallenged by Essig on appeal, is relevant to such analysis and states,

> In closing the Miller Bates Loan, and in underwriting the lender's policy in favor of GSD, Chicago Title Company of Washington, and Chicago Title Insurance Company reasonably relied upon the documents supplied by Michael Lai purporting to establish his authority to borrow on behalf of GSD. In entering into the loan agreement, which was secured by the Deed of Trust on GSD property, Miller Bates reasonably relied upon the documents supplied by Michael Lai purporting to establish his authority to borrow on behalf of GSD. Chicago Title's and Miller Bates' reliance upon the documents supplied by Michael Lai purporting to establish his authority to borrow on behalf of GSD was reasonable, and Chicago Title and Miller Bates conducted reasonable due diligence in, respectively, closing the Miller Bates Loan and extending the Miller Bates Loan.

Because FF 6 is a verity, we accept as a fact that Chicago Title's conduct with regard to the Miller Bates loan transaction was reasonable and, therefore, necessarily cannot constitute "gross and inexcusable" negligence such that it violated any of its legal duties.[13] Essig does not establish that the trial court erred in its assessment of whether he carried his evidentiary burden as to the affirmative defense under the *Parker* standard. Whether we affirm on that basis or on application of *McKelvie,* which requires Essig to establish Chicago Title's unclean hands as to *him* despite the fact that he was not a party to the transaction on which he relies for this affirmative defense, the outcome is the same.

Affirmed.

WE CONCUR:

Chung, J.          Coburn, J.

---

[13] Chicago Title separately notes, as it argued before the trial court, that Essig failed to "introduc[e] any admissible evidence of standards in the title insurance and loan closing industry," such as expert testimony, to establish what its legal duties were with regard to the Miller Bates loan transaction. As the party asserting the affirmative defense, Essig necessarily carried the burden to identify the duties he argues were not met as a result of Chicago Title's purported failure to exercise reasonable care and due diligence.